**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CONTRARIAN CAPITAL MANAGEMENT, L.L.C., CONTRARIAN CAPITAL FUND I, L.P., CONTRARIAN DOME DU GOUTER MASTER FUND, LP, CONTRARIAN CAPITAL SENIOR SECURED, L.P., CONTRARIAN EM II, LP, CONTRARIAN EMERGING MARKETS, L.P., BOSTON PATRIOT SUMMER ST LLC, POLONIUS HOLDINGS, LLC, EMMA 1 MASTER FUND, L.P., CONTRARIAN FUNDS, L.L.C., and E1 SP, A SEGREGATED ACCOUNT OF EMAP SPC, <br><br> Plaintiffs, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | Nos. 21 Misc. 18, 22 Misc. 131 & 22 Misc. 263 (LPS) |

**OPENING BRIEF IN SUPPORT OF CONTRARIAN'S RENEWED MOTION FOR**
**AN ORDER AUTHORIZING A WRIT OF ATTACHMENT *FIERI FACIAS***

Steven F. Molo (admitted *pro hac vice*)
Justin M. Ellis (admitted *pro hac vice*)
Lauren F. Dayton (admitted *pro hac vice*)
Mark W. Kelley (admitted *pro hac vice*)
Ryan Yeh (admitted *pro hac vice*)
MOLOLAMKEN LLP
430 Park Avenue, 6th Floor
New York, NY  10022
Tel.: (212) 607-8170
Fax: (212) 607-8161

Lois S. Ahn (admitted *pro hac vice*)
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, DC  20037
Tel.: (202) 556-2000
Fax: (202) 556-2001

Rebecca L. Butcher (#3816)
Jennifer L. Cree (#5919)
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, DE  19801
Tel.: (302) 467-4400
Fax: (302) 467-4450
butcher@lrclaw.com
cree@lrclaw.com

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

I.  Contrarian's Lawsuits and Judgments ............................................................ 2

II.  This Court's Prior Alter-Ego Rulings ............................................................. 3

    A.  *Crystallex* and Venezuela's Control of PDVSA under Maduro as of
       August 2018 ............................................................................................3

    B.  *OIEG* and Venezuela's Control of PDVSA under Guaidó and Maduro
       through March 2023................................................................................4

III.  Venezuela's Continued Control of PDVSA Following *OIEG I* ....................... 6

    A.  The National Assembly's Continued Control of PDVSA Outside of
       Venezuela................................................................................................6

        1.  The National Assembly's Significant Economic Control........................... 6

           a.  The Constitution and Laws of Venezuela Continue To
              Enable the National Assembly's Economic Control ...................... 7

           b.  The National Assembly's Oversight of PDVSA's Finances .......... 7

           c.  The National Assembly's Authority under the 2023
              Transition Statute......................................................................... 8

           d.  The National Assembly's Commingling of Funds
              with PDVSA ................................................................................ 10

        2.  PDVSA's Profits Outside of Venezuela Go to the National Assembly.... 11

        3.  The National Assembly Controls PDVSA's Daily Affairs Outside of
           Venezuela................................................................................ 11

        4.  The National Assembly Is the Real Beneficiary of PDVSA's Conduct
           Outside of Venezuela ............................................................... 12

        5.  The National Assembly Continues To Benefit in U.S. Courts While
           Avoiding Its Obligations........................................................... 13

    B.  The Maduro Regime's Continued Control of PDVSA in Venezuela...................13

        1.  The Maduro Regime's Significant Economic Control ............................. 13

i

a. The Constitution and Laws of Venezuela Continue To Enable the Maduro Regime's Economic Control ......................... 14

b. The Maduro Regime's Oversight of PDVSA's Business Decisions ................................................................. 14

2. PDVSA's Profits in Venezuela Go to the Maduro Regime .................... 15

3. The Maduro Regime Controls PDVSA's Daily Affairs in Venezuela ..... 15

4. The Maduro Regime Is the Real Beneficiary of PDVSA's Conduct in Venezuela ................................................................. 17

5. The Maduro Regime Continues To Benefit in U.S. Courts While Avoiding Its Obligations ................................................................. 18

ARGUMENT ................................................................................................................. 18

I. The Venezuela Parties Are Estopped from Contesting Their Alter-Ego Status before March 23, 2023 ................................................................................... 18

A. The Venezuela Parties Are Collaterally Estopped ................................................. 18

1. The Issues Are Identical ................................................................. 19

2. The Issue Was Actually Litigated ................................................................. 20

3. The Issue Was Decided by Final Judgments ................................................ 22

4. The Issue Was Essential to the Prior Judgments ....................................... 22

B. The Venezuela Parties Are Judicially Estopped ................................................. 23

II. The FSIA Permits Attachment of PDVSA's PDVH Shares ......................................... 24

A. There Is No Attachment Immunity ................................................................. 25

1. Venezuela Holds the PDVH Shares in the United States Through Its Alter Ego, PDVSA ................................................................. 25

2. The PDVH Shares Are Being Used for a Commercial Activity .............. 27

3. Venezuela Has Waived Attachment Immunity ........................................ 27

4. A Reasonable Amount of Time Has Passed since Entry of Judgment ..... 27

B. There Is No Jurisdictional Immunity ................................................................. 28

III. Delaware Law Permits Attachment of PDVSA's PDVH Shares ................................ 28

IV. The Court Should Name Plaintiffs Additional Judgment Creditors ......................... 30

CONCLUSION ................................................................................................................. 30

## **TABLE OF AUTHORITIES**

Page(s)

### CASES

*Alevras v. Tacopina*,
226 F. App'x 222 (3d Cir. 2007) ............................................................................19

*In re Brown*,
951 F.2d 564 (3d Cir. 1991)....................................................................................22

*Contrarian Cap. Mgmt., L.L.C. v. Bolivarian Republic of Venezuela*,
No. 19 Civ. 11018, 2020 WL 5849013 (S.D.N.Y. Oct. 1, 2020) ...........................28

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
333 F. Supp. 3d 380 (D. Del. 2018)................................................................. *passim*

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
932 F.3d 126 (3d Cir. 2019)............................................................................ *passim*

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
No. 17 Misc. 151, 2021 WL 129803 (D. Del. Jan. 14, 2021)...........................23, 24

*Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*,
251 F. Supp. 3d 758 (D. Del. 2017)........................................................................29

*Devon Drive Lionville, LP v. Parke Bancorp, Inc.*,
No. 15 Civ. 3435, 2017 WL 5668053 (E.D. Pa. Nov. 27, 2017)............................19

*United States ex rel. Doe v. Heart Sol., PC*,
923 F.3d 308 (3d Cir. 2019)....................................................................................19

*In re Graham*,
973 F.2d 1089 (3d Cir. 1992)..................................................................................21

*Kairys v. I.N.S.*,
981 F.2d 937 (7th Cir. 1992) ..................................................................................21

*Kauffman v. Moss*,
420 F.2d 1270 (3d Cir. 1970)..................................................................................19

*McLaughlin v. Fisher*,
277 F. App'x 207 (3d Cir. 2008) .............................................................................19

*Meadows v. Dominican Republic*,
817 F.2d 517 (9th Cir. 1987) ..................................................................................29

iii

*Montana v. United States*,
    440 U.S. 147 (1979)...................................................................................23

*In re Myers*,
    491 F.3d 120 (3d Cir. 2007)....................................................................23

*New Hampshire v. Maine*,
    532 U.S. 742 (2001).................................................................................24

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
    419 F. Supp. 3d 51 (D.D.C. 2019)...........................................................28

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
    No. 19 Misc. 290, 2023 WL 2609248 (D. Del. Mar. 23, 2023) ..................... *passim*

*OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*,
    No. 23-1647, 2023 WL 4385930 (3d Cir. July 7, 2023)......................... *passim*

*Parklane Hosiery Co. v. Shore*,
    439 U.S. 322 (1979).................................................................................23

*Raytech Corp. v. White*,
    54 F.3d 187 (3d Cir. 1995).......................................................................22

*Red Tree Invs., LLC v. Petróleos de Venezuela, S.A.*,
    No. 22 Misc. 68, 2022 WL 1265516 (D. Del. Apr. 28, 2022).................28

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992).................................................................................27

*In re Resyn Corp.*,
    945 F.2d 1279 (3d Cir. 1991)...................................................................23

*Rubin v. Islamic Republic of Iran*,
    138 S. Ct. 816 (2018)...............................................................................25

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
    81 F.3d 355 (3d Cir. 1996)................................................................23, 24

*Scooper Dooper, Inc. v. Kraftco Corp.*,
    494 F.2d 840 (3d Cir. 1974).....................................................................20

*United States v. Brace*,
    334 F.R.D. 472 (W.D. Pa. 2020) .............................................................21

*United States v. Silliman*,
    167 F.2d 607 (3d Cir. 1948).....................................................................21

*Yamaha Corp. of Am. v. United States*,
  961 F.2d 245 (D.C. Cir. 1992) ..................................................................19

*Yeshiva Imeri Chaim Viznitz of Boro Park, Inc. v. City of New York*,
  496 F. App'x 122 (2d Cir. 2012) ...............................................................23

**STATUTES & RULES**

28 U.S.C. § 1604 ..................................................................................................25

28 U.S.C. § 1605(a)(1) ........................................................................................28

28 U.S.C. § 1610 ..................................................................................................25

28 U.S.C. § 1610(a) ..............................................................................................25

28 U.S.C. § 1610(a)(1) ........................................................................................25

28 U.S.C. § 1610(c) .................................................................................3, 25, 27, 30

8 *Del. C.* § 169 .....................................................................................................29

8 *Del. C.* § 324(a) ............................................................................................28, 29

10 *Del. C.* § 5031 ................................................................................................29

Fed. R. Civ. P. 69(a)(1) ....................................................................................28, 29

**OTHER AUTHORITIES**

Restatement (Second) of Judgments § 27 cmt. C ...............................................20

3 Moore's Fed. Prac. & Proc. § 30.73 (2023) ...................................................21

18 Wright & Miller, Fed. Prac. & Proc. § 4419 (3d ed. 2023) ........................20

18 Wright & Miller, Fed. Prac. & Proc. § 4443 (3d ed. 2023) ........................24

Contrarian Capital Management, L.L.C., Contrarian Capital Fund I, L.P., Contrarian Dome du Gouter Master Fund, LP, Contrarian Capital Senior Secured, L.P., Contrarian EM II, LP, Contrarian Emerging Markets, L.P., Boston Patriot Summer St LLC, Polonius Holdings, LLC, Emma 1 Master Fund, L.P., Contrarian Funds, L.L.C., and E1 SP, a Segregated Account of EMAP SPC (together, "Contrarian") respectfully submit this brief in support of their Renewed Motion for an Order Authorizing a Writ of Attachment *Fieri Facias* against shares of PDV Holding, Inc. ("PDVH") owned by Intervenor Petróleos de Venezuela, S.A. ("PDVSA"), alter ego of Defendant Bolivarian Republic of Venezuela ("Venezuela" or "the Republic," and together with PDVSA, the "Venezuela Parties").[1]

## **INTRODUCTION**

This Court has held that PDVSA was Venezuela's alter ego through March 23, 2023. Venezuela is estopped from relitigating that finding, which resolved most of the facts relevant to this motion.  Additional facts make clear PDVSA continues to be Venezuela's alter ego today.

Little has changed since March 2023.  In the United States, PDVSA continues to pay Venezuela's U.S. litigation expenses.  The National Assembly continues to hold veto power over PDVSA's contracts.  Venezuela and PDVSA continue to work together to realize Venezuela's political ambitions.  And although the National Assembly passed a transition statute that removed the former interim president, Juan Guaidó, that statute codifies the same control over PDVSA, using the same statutory language, that the Court considered in its last alter-ego decision.  While the National Assembly appointed a council to administer its assets, including PDVSA, that council is an extension of, and beholden to, the National Assembly.

---

[1] Pursuant to Local Rule 69.1, Contrarian is submitting a proposed writ of attachment *fieri facias* and a praecipe with this motion.  *See* Declaration of Mark W. Kelley in Support of Contrarian's Renewed Motion for a Writ of Attachment *Fieri Facias*, Exs. 1, 2.

Nicolás Maduro's regime also continues to dominate PDVSA in Venezuela.  Government officials hold key posts at PDVSA and use it to carry out Maduro's agenda at the expense of PDVSA's interests.   The regime dictates PDVSA's production, sales, management, and investments.  PDVSA refers to its assets as Venezuela's and uses them to realize the Republic's domestic and foreign policy goals, including the provision of state services such as healthcare.

PDVSA and Venezuela remain alter egos.

## BACKGROUND

### I.    CONTRARIAN'S LAWSUITS AND JUDGMENTS

Contrarian is the beneficial owner of bonds issued by Venezuela (the "Bonds") under two fiscal agency agreements.  *Contrarian Cap. Mgmt., LLC v. Bolivarian Republic of Venezuela*, No. 19 Civ. 11018 (S.D.N.Y.) (the "-11018 Action"), D.I. 37-14 ¶15.  Venezuela defaulted on its obligations under the Bonds after the Maduro Regime announced a restructuring of Venezuela's foreign debt.  *See* Kelley Ex. 6; -11018 Action, D.I. 74 at 2-3.  PDVSA defaulted on its unsecured foreign debt then, too.[2]  Venezuela and PDVSA remain in default today.

In November 2019, Contrarian sued Venezuela in the Southern District of New York to recover unpaid principal and interest.  *See* -11018 Action, D.I. 1.  In October 2020, the court granted summary judgment and entered judgment against Venezuela.  *Id.*, D.I. 74, 81.  In May 2021, the court issued a second judgment reflecting attorney's fees and additional unpaid interest.  *Id.*, D.I. 119.  In October 2021, the court issued a third judgment on additional claims.  *Id.*, D.I. 126.  In July 2021, the court held that a reasonable amount of time had passed since the May 2021

---

[2] *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, Nos. 20-3858 & 20-4127 (2d Cir.), D.I. 107 at 10 (admitting "PDVSA defaulted on all of its debt" in 2017 except certain secured bonds).

judgment was entered and that Contrarian may enforce it. *Id.*, D.I. 120; *see* 28 U.S.C. § 1610(c). The three judgments total more than $393 million. Kelley Decl. ¶ 5.

Contrarian has registered all three judgments with this Court. No. 21 Misc. 18, D.I. 1; No. 22 Misc. 131, D.I. 1; No. 22 Misc. 263, D.I. 1; Kelley Exs. 3, 4, 5. Venezuela has not paid any part of the judgments, Kelley Decl. ¶ 11, and there is no reason to believe that it will soon.

## II.   THIS COURT'S PRIOR ALTER-EGO RULINGS

This Court already found – in two different rulings, each affirmed by the Third Circuit – that PDVSA was Venezuela's alter ego through March 2023.

### A.   *Crystallex* and Venezuela's Control of PDVSA under Maduro as of August 2018

In its *Crystallex* decision, this Court held that PDVSA was the alter ego of Venezuela as of August 2018 under the regime of President Nicolás Maduro. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 386 (D. Del. 2018) ("*Crystallex I*"). Considering evidence dating back to 2002, this Court found that Venezuela extensively controlled PDVSA by: requiring PDVSA to sell discounted oil to Venezuela's allies "for no, or *de minimis*, consideration"; causing PDVSA to fund social programs "that have nothing to do with its business"; receiving all of PDVSA's profits as its sole shareholder; and appointing directors and officers that "deprived PDVSA of independence from close political control." *Id.* at 406-11. PDVSA, on the other hand, disregarded its separate legal status, referring to itself as Venezuela and "disseminat[ing] Venezuelan propaganda through its social media." *Id.* at 407. PDVSA also acknowledged in its bond offerings that Venezuela had the authority to "intervene in [PDVSA's] commercial affairs" and impose "material commitments" on PDVSA. *Id.* The Third Circuit affirmed, holding that the alter-ego test was "easily satisfied." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 146 (3d Cir. 2019) ("*Crystallex II*").

3

**B.**     *OIEG* **and Venezuela's Control of PDVSA under Guaidó and Maduro through March 2023**

In August 2018, at the time *Crystallex I* was decided, Maduro was both *de jure* and *de facto* President of Venezuela.  *See OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, No. 19 Misc. 290, 2023 WL 2609248, at *8 (¶63) (D. Del. Mar. 23, 2023) ("*OIEG I*").   In January 2019, Venezuela's opposition-led National Assembly rejected Maduro's claim for a second presidential term and named Juan Guaidó interim president of Venezuela.[3] *Id.* (¶¶65-67).  The United States recognized Guaidó as interim president.  *Id.* (¶¶68-69).  On February 6, 2019, the National Assembly enacted the 2019 Transition Statute, which identified Guaidó as President of Venezuela and authorized him to appoint an *ad hoc* Board of PDVSA to exercise PDVSA's rights as shareholder of PDVH (subject to National Assembly approval).  *See* Kelley Ex. 7, Art. 34.

Following *Crystallex I*, additional creditors – including OI European Group B.V., or "OIEG" – moved to attach PDVSA's shares in PDVH to satisfy judgments against Venezuela based on its alter-ego relationship with PDVSA.  *OIEG I*, at *1.  Ruling in favor of the additional creditors, this Court rejected the Venezuela Parties' assertion that PDVSA was no longer Venezuela's alter ego following recognition of the Guaidó Government.  *Id.* at *2.  It found that PDVSA continued to be Venezuela's alter ego, "both in the U.S. and in Venezuela," whether it considered Maduro or Guaidó, and whether the "pertinent time" began with the filing of a motion for writ of attachment or with the "date of injury."  *Id.* at *2, *21, *24, *27.

With respect to the Guaidó Government and the National Assembly, the Court found the 2019 Transition Statute legislated Venezuela's control over PDVSA by empowering Guaidó to

---

[3] This brief refers to the legislative branch associated with the interim government as the "National Assembly," and the legislative branch associated with the Maduro Regime as the "National Constituent Assembly."

appoint an *ad hoc* Board that exercised PDVSA's rights as a shareholder of PDVH.  *OIEG I*, at *22.  It found that the National Assembly's power to require preapproval of PDVSA contracts gave it control over the daily affairs of PDVSA.  *Id.*  And it found evidence of significant economic control because the National Assembly, through Guaidó, treated Venezuela and PDVSA's debts as equivalent for purposes of debt renegotiation, had direct access to PDVSA's funds, and considered PDVSA's assets as assets of Venezuela.  *Id.* at *22-23.

With respect to the Maduro Regime, the Court found that Maduro exercised extensive control over PDVSA by dictating its oil prices in Venezuela and abroad.  *OIEG I*, at *24-25.  It found that Maduro managed PDVSA's daily affairs by appointing military personnel and government officials as PDVSA's board members and officers.  *Id.*  And it found that the real beneficiary of PDVSA's conduct was Venezuela, as demonstrated by its use of PDVSA's property for government activities and in furtherance of foreign policy objectives.  *Id.* at *25.  Further, the Court found that, considering either Guaidó or Maduro, allowing PDVSA to adhere to a separate identity would allow Venezuela to "derive[] significant benefits from the U.S. judicial system" while avoiding its obligations.  *Id.* at *22, *26 (quoting *Crystallex II*, 932 F.3d at 149).

The Third Circuit affirmed.  *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, No. 23-1647, 2023 WL 4385930 (3d Cir. July 7, 2023) ("*OIEG II*").  Its decision clarified two points of law relating to the alter-ego analysis.  First, it held that the actions of both governments – the Maduro Regime in Venezuela and the Guaidó Government outside of Venezuela – must be considered for the alter-ego analysis because the "relevant 'government' . . . is the foreign country's sovereign, which transcends any administrator."  *OIEG II*, at *7.  Second, it held that the inquiry should consider "all relevant facts up to the time of the service of the writ of attachment," not just the time between moving for and service of the writ.  *Id.* at *9.  It noted that

limiting the analysis to a narrower window of time after a state's acts are under scrutiny might "invite fraud and injustice." *Id.* at *8.

### III.   VENEZUELA'S CONTINUED CONTROL OF PDVSA FOLLOWING *OIEG I*

#### A.   The National Assembly's Continued Control of PDVSA Outside of Venezuela

Little has changed since the alter-ego issue was last litigated. On January 4, 2023 – more than two months before this Court's decision in *OIEG I* – the National Assembly enacted the 2023 Transition Statute. Kelley Ex. 10 (the "2023 Transition Statute") at 1. It eliminated the position of interim president and removed Guaidó from power. *Id.* However, the statute did not change PDVSA's alter-ego relationship with Venezuela – it simply transferred powers previously held by the interim president to the National Assembly. Expert Report of Manuel A. Gomez ("Gomez Report") ¶¶ 27-28. The statute preserves the operative language from the 2019 Transition Statute authorizing Venezuela's continued domination of PDVSA. *Id.* ¶¶ 23-26. And the statute created an Asset Protection Council to better leverage Venezuela's foreign assets – including PDVSA – to reestablish democracy in Venezuela. *Id.* ¶ 24. The National Assembly has preserved or expanded the same powers it previously exercised over PDVSA and its subsidiaries. Thus, PDVSA continues to be Venezuela's alter ego.[4]

#### 1.   *The National Assembly's Significant Economic Control*

In the United States and outside of Venezuela, the National Assembly continues to exercise significant economic control over PDVSA through Venezuela's Constitution, the 2023 Transition Statute, the Asset Protection Council, the PDVSA *ad hoc* Board, and commingling of funds.

---

[4] Nor did the 2023 Transition Statute inaugurate a new legal regime – the United States "continues to recognize" the National Assembly as the government of Venezuela. Kelley Ex. 11 at 1 (Jan. 3., 2023 U.S. State Department press statement).

       a.    *The Constitution and Laws of Venezuela Continue To Enable the National Assembly's Economic Control*

Venezuela's Constitution has not changed since the Third Circuit held that it "endows the State with significant control over PDVSA."  *Crystallex II*, 932 F.3d at 147; *see also OIEG I*, at *22 ("Economic control of PDVSA remains as engrafted in Venezuela's Constitution now as it was in August 2018."); Kelley Ex. 12 at 4; Ex. 13 at 1 (PDVSA discovery responses).  Article 12 provides that hydrocarbon deposits within Venezuela are the property of the Republic; Article 302 reserves all petroleum activity to the Republic; and Article 303 requires that Venezuela retain all shares in PDVSA.  Kelley Ex. 14, Arts. 12, 302, 303.  "These statements of authority are not merely aspirational" – they allow Venezuela to "dictate[] PDVSA's sales practices and prices, inside Venezuela and abroad," including by dictating the terms of PDVSA's debt.  *OIEG II*, at *9.

The Constitution also continues to give the National Assembly veto power over PDVSA contracts which implicate the "national interest" – a power PDVSA has twice acknowledged includes ***all contracts with foreign parties***.  Kelley Ex. 15, Arts. 150, 187.9; Ex. 16 at 30 n.84 (PDVSA summary judgment brief); Ex. 17 at 85:21-86:7 (Apr. 30, 2021 *OIEG I* Hr'g Tr.) (Chairman of PDVSA *ad hoc* Board acknowledging that PDVSA "always" allows the National Assembly to review and approve its contracts).  This power to review contracts enables substantial economic control over PDVSA.  For example, the National Assembly invoked this power when it declared PDVSA's bonds void and illegal.  *OIEG I*, at *10 (¶86).

       b.    *The National Assembly's Oversight of PDVSA's Finances*

The National Assembly exercises economic control directly over PDVSA's operations and assets.  For example, PDVSA continues to follow the National Assembly's debt-negotiation strategy and instruction not to pay PDVSA's debts.  *OIEG I*, at *13 (¶¶108, 112) (citing Kelley Ex. 19 at 12; Ex. 20 at 3-4).  And in May of this year, the National Assembly directed the PDVSA

*ad hoc* Board to resolve PDVSA's debt without losing control of CITGO.  Kelley Ex. 18 (May 5, 2023 National Assembly press release).  The National Assembly recently began requiring regular "management reports" from PDVSA detailing its activities.  Kelley Ex. 21 (Feb. 24, 2023 National Assembly press release).  Earlier this year, it summoned the chair of the PDVSA *ad hoc* Board to appear and justify PDVSA's litigation expenses and decision to pay certain bonds.  *Id.*  And it announced in February that it will demand the same management reports and testimony from CITGO which it demanded from PDVSA.  Kelley Exs. 21, 24, 25 (National Assembly press releases).  The National Assembly's economic control is further demonstrated by its objections to the Maduro Regime's management decisions.  Kelley Exs. 22, 23 (June 13, 2023 National Assembly press releases); *see OIEG I*, at *11 (¶ 89) (noting that the National Assembly's objection to Maduro's management of PDVSA demonstrates its "understanding that the Republic should exercise economic control over PDVSA's transactions").

c.   <em>The National Assembly's Authority under the 2023 Transition Statute</em>

The National Assembly also exercises economic control over PDVSA through the 2023 Transition Statute.  That statute does not give PDVSA independence – in fact, **on the same day** the statute was enacted, PDVSA loaned Venezuela over $500,000 with no repayment date.  Kelley Ex. 9 at 2-3 (PDVSA amended interrogatory responses).  The 2023 Transition Statute maintains the same provisions from the 2019 Transition Statute that enable the National Assembly to dominate PDVSA.  Gomez Report ¶¶ 23, 25.   At the same time, it removed political checks on the National Assembly – the office of the interim president and the Special Attorney General – violating Venezuelan law governing the separation of powers and allowing the National Assembly to more effectively wield PDVSA "for political gain" and as a tool to force out Maduro.  *Id.* ¶¶ 21, 27-31.  In service of that goal, the 2023 Transition Statute created the Asset Protection Council,

8

which has "authority" over "all foreign property or assets" of Venezuela and the power to "participat[e] in the management" of those assets, including PDVSA and its subsidiaries, "when it deems convenient." 2023 Transition Statute §§ 9, 13. The National Assembly appoints all five members of the Asset Protection Council, which appoints the PDVSA *ad hoc* Board (subject to National Assembly approval). *Id.*

Through the 2023 Transition Statute, the National Assembly also continues to "bypass[ ] PDVSA's ordinary corporate governance" by exercising control over PDVSA's subsidiary, PDVH. *OIEG I*, at *11 (¶ 96). Using **the same statutory language** used in the 2019 Transition Statute, the 2023 Transition Statute:

- Overrides Venezuelan law governing PDVSA's authority over PDVH;

- Prohibits PDVH from making any "payment[ ] or equity contribution[ ]" to PDVSA;

- Prohibits the sale, encumbrance, or disposition of PDVSA's assets, including PDVH;

- Subjects PDVH to National Assembly "monitoring and accountability controls"; and

- Prohibits PDVH from having any "relationship whatsoever" with the Maduro Regime.

2023 Transition Statute §§ 13, 14; *see also* Gomez Report ¶¶ 23-25.

As to the Asset Protection Council, "every act" it performs is required to "prioritize" the National Assembly's political goals. 2023 Transition Statute § 2. The Council itself is comprised of Venezuelan opposition figures, and its coordinator, Gustavo Marcano, is one of the original defectors from the Maduro Regime and Guaidó's Minister Counselor of the Venezuelan Embassy in the United States. *See* Kelley Exs. 26, 27, 28 (news articles). The council is no less politically motivated than Guaidó and has preserved all of Guaidó's appointments to the PDVSA *ad hoc* Board. *See* Kelley Ex. 29 (June 1, 2021 presidential dispatch); Exs. 9, 10 (PDVSA interrogatory responses). Moreover, the Council operates at the behest of the National Assembly – any change it makes to the membership of the PDVSA *ad hoc* Board, and even its hiring of auditing firms, is

subject to National Assembly approval.  2023 Transition Statute §§ 8.7, 13.  And to further the National Assembly's goal of keeping PDVSA's assets out of Maduro's hands, the 2023 Transition Statute prohibits the Asset Protection Council from selling, encumbering, or disposing of PDVSA's assets.  *Id.* § 14.

The PDVSA *ad hoc* Board is an extension of the National Assembly, too.  It has, "since its inception," worked to aid in Venezuela's recovery, and it acknowledges that it "operates at the 'directives'" of the National Assembly, *OIEG I*, at *11 (¶ 98); Kelley Ex. 19 at 72 (PDVSA presentation).  The PDVSA *ad hoc* Board describes PDVSA as "'attached to'" and "controlled by" Venezuela's Ministry of Petroleum and Mining and as "part of the National Public Administration of the Venezuelan Republic."  Kelley Ex. 16 at 30 n.84 (PDVSA brief).  The *ad hoc* Board is still composed of Guaidó appointees, and the chairman of the *ad hoc* Board recently signaled endorsement of a proposal to use **CITGO oil** to pay **Venezuela's debts**.  Kelley Ex. 31 (July 2023 news article); Ex. 32 (June 2023 interview with chairman of PDVSA *ad hoc* Board).

d.    *The National Assembly's Commingling of Funds with PDVSA*

The National Assembly and PDVSA continue to commingle funds.  The National Assembly pays for PDVSA's operational costs, including "personnel expenses" and costs relating to "materials and supplies."  Kelley Ex. 33 at 5-7 (Mar. 20, 2023 National Assembly finance commission report).  It has the power to use PDVSA funds to pay for its own "ordinary expenses" and "the defense of [Venezuela's] foreign assets."  2023 Transition Statute § 14 ¶ 2.  And PDVSA has paid more than $1 million of Venezuela's litigation expenses in the last eight months through transfers it purports to be loans, but which lack a repayment schedule.  Kelley Ex. 9 at 2-3 (PDVSA interrogatory responses).  The PDVSA *ad hoc* Board is also "consider[ing]" a plan to pay Venezuela's debts using its subsidiary's oil.  Kelley Ex. 32 (June 2023 interview).

Further, the Liberation Fund Law, enacted in 2023, authorizes the use of PDVSA's funds to effectuate "the liberation of Venezuela."  Kelley Ex. 34 (2023 Liberation Fund Law) §§ 1-3; 2023 Transition Statute §§ 1, 14.  The Liberation Fund Law does not distinguish between PDVSA and Venezuela funds, referring to all as "resources of the Bolivarian Republic of Venezuela . . . in bank accounts abroad."  Kelley Ex. 34 (2023 Liberation Fund Law) § 2; *see OIEG I*, at *10-11 (¶¶ 87, 90-91).

### 2.    *PDVSA's Profits Outside of Venezuela Go to the National Assembly*

Nothing has changed with respect to PDVSA's foreign profits.  They all go to the National Assembly.  *OIEG I*, at *11 (¶ 93) (quoting *Crystallex II*, 932 F.3d at 148 ("As PDVSA's lone shareholder, all profit ultimately runs to the Venezuelan government.")); *see also OIEG II*, at *10. The National Assembly continues to refer to PDVSA's assets as "assets held by the Republic," "state owned assets," and "belonging to all Venezuelans," including in the 2023 Transition Statute itself.  *See* 2023 Transition Statute pmbl. & §§ 2, 5, 8, 9, 13, 14; Kelley Ex. 21 (Feb. 24, 2023 National Assembly press release).  The PDVSA *ad hoc* Board tweeted in November 2022 that **its own assets** "belong to all Venezuelans," and *ad hoc* Board member Yon Goicoechea tweeted the same thing in March 2023.  Kelley Ex. 35 (*ad hoc* Board tweet); Ex. 36 (Goicoechea tweet).

### 3.    *The National Assembly Controls PDVSA's Daily Affairs Outside of Venezuela*

Venezuela continues to exercise extensive control over PDVSA's daily activities outside of Venezuela.  While the 2023 Transition Statute replaced Guaidó with the Asset Protection Council as the entity with power over PDVSA, it did not alter any of those powers, and in fact used the same language to enshrine them.  *See* pp. 8-9, *supra*.  The National Assembly has exhibited even greater control over the daily affairs of PDVSA and its subsidiaries than before the 2023 Transition Statute took effect by demanding management reports and explanations of

PDVSA's business decisions.  *See* p. 8, *supra*.  And the National Assembly continues to control the PDVSA *ad hoc* Board by controlling its membership, directing when it can make payments on debt, retaining veto power over national interest contracts, prohibiting the disposition of PDVSA's assets, and receiving "loans" from PDVSA.  *See* p. 10, *supra*.

Indeed, the National Assembly's control is so granular that it funds PDVSA's operations, including "personnel" and "materials and supplies."  Kelley Ex. 33 at 5.  It recently instructed PDVSA to organize its debt-litigation strategy in a manner that maintains control of CITGO.  *See* Kelley Ex. 18 (May 5, 2023 National Assembly press release).  And it continues to exercise control over the daily affairs of PDVSA's **subsidiaries**, including CITGO.  The prohibition upon PDVH and its subsidiaries from having any relationship with the Maduro Regime is a significant limitation for an oil company, given that Venezuela has the world's largest proven oil reserve.  The prohibition upon equity contributions to PDVSA infringes PDVSA's shareholder rights, and PDVSA has admitted that it, PDVH, CITGO Holdings, and CITGO Petroleum have not made any dividend payments since at least October 2022.  Kelley Ex. 8 at 8 (PDVSA interrogatory response).  And as part of its "monitoring and accountability controls," the National Assembly plans to demand management reports from CITGO, PDVH's subsidiary.  2023 Transition Statute § 13; *see* p. 8, *supra*.

4.   *The National Assembly Is the Real Beneficiary of PDVSA's Conduct Outside of Venezuela*

The National Assembly has used PDVSA as a political tool for years, and it continues to benefit from PDVSA's conduct by requiring PDVSA to prioritize Venezuela's political objectives.  *See* Gomez Report ¶¶ 19-23.  The 2023 Transition Statute requires that PDVSA and its subsidiaries are to be governed with the goal of facilitating "the democratic transition in the Bolivarian Republic of Venezuela."  2023 Transition Statute § 1.  The PDVSA *ad hoc* Board's "'main

objective' " is to establish democratic government in Venezuela.  *OIEG I*, at \*12 (¶ 105) (quoting Louis Pacheco, former Chairman of PDVSA *ad hoc* Board).  The National Assembly website still provides updates on PDVSA and its subsidiaries, referring to them as assets of the Republic.  *See, e.g.*, Kelley Ex. 18; *see OIEG I*, at \*13 (¶ 113).  And the National Assembly continues to instruct PDVSA to organize its litigation strategy in a manner that benefits Venezuela.  Kelley Ex. 18 (May 5, 2023 National Assembly press release).

        5.     *The National Assembly Continues To Benefit in U.S. Courts While Avoiding Its Obligations*

For the same reasons this Court explained in *OIEG I*, treating Venezuela and PDVSA separately would entitle Venezuela to the benefit of immunity from attachment of its assets in the United States while allowing it to avoid debts it acknowledges are owed.  *OIEG I*, at \*14 (¶¶ 120-121).  As both this Court and the Third Circuit observed, Venezuela benefits from the U.S. judicial system because certain of its bonds are backed by the stock and assets of U.S. based corporations, and thus investors may rely on the assurance that the U.S. legal system will provide a backstop in case of default.  *Id.* (¶ 121) (quoting *Crystallex II*, 932 F.3d at 149).

**B.     The Maduro Regime's Continued Control of PDVSA in Venezuela**

The Maduro Regime continues to exercise the same control over PDVSA that supported this Court's March 23, 2023 decision in *OIEG I*.

        1.     *The Maduro Regime's Significant Economic Control*

PDVSA is a state-run oil company.  The Maduro Regime's economic control over PDVSA is guaranteed under Venezuelan law and demonstrated by the regime's substantial oversight of PDVSA's business decisions.

a.      *The Constitution and Laws of Venezuela Continue To Enable the Maduro Regime's Economic Control*

Venezuela's laws guarantee the Maduro Regime economic control over PDVSA within Venezuela. Articles 12, 302, and 303 of the Venezuelan Constitution ensure the Republic's control over its hydrogen deposits, all petroleum activity, and the shares of PDVSA. *OIEG I*, at *9 (¶¶ 79-81); Kelley Ex. 14. And Article 5 of the Organic Hydrocarbons Law requires PDVSA's revenues to be used to finance health and education, macroeconomic stabilization, and investment within Venezuela. *Crystallex II*, 932 F.3d at 147.

PDVSA has a "constitutionally prescribed role" of "'manag[ing] the Venezuelan oil industry.'" Kelley Ex. 16 at 31 (PDVSA brief). The Maduro Regime possesses "the power to intervene and mandate PDVSA's economic policies," which enables it to, for example, require PDVSA to make investments unrelated to its oil business, such as in Venezuelan social programs. *Crystallex II*, 932 F.3d at 146-47; *OIEG I*, at *14 (¶ 117); Kelley Ex. 38 (PDVSA webpage discussing "social development projects"); Ex. 39 at 3 (PDVSA manages hospital facilities).

b.      *The Maduro Regime's Oversight of PDVSA's Business Decisions*

Venezuela continues to "dictat[e] to whom PDVSA must sell oil and at what price." *Crystallex II*, 932 F.3d at 147. In July 2023, PDVSA increased the domestic price of diesel in the industrial sector but maintained subsidies for the health sector in compliance with a resolution from the Ministry of Petroleum. Kelley Ex. 40 (July 6, 2023 news article). Maduro also recently "instruct[ed]" PDVSA's president to work with Vietnam's state-owned oil company, PetroVietnam. Kelley Ex. 41 (Mar. 14, 2023 PDVSA press release). The Maduro Regime continues to require PDVSA to supply oil to Venezuela's foreign allies to fulfill Venezuela's prior commitments, even during a severe production crisis, underscoring "how ideological alliances are being given priority over business." Kelley Exs. 42, 43, 44 (news articles describing PDVSA's

supply of oil to Cuba, Ira, and China in November 2022 and March 2023); Exs. 45, 46 (Venezuelan oil production plummeting).  Just this month, Venezuela shipped over 110,000 barrels of oil to Cuba on the *Maria Cristina*.  Kelley Ex. 47 (vessel tracking data).

2.   *PDVSA's Profits in Venezuela Go to the Maduro Regime*

As this Court previously found, PDVSA's profits go to Venezuela, its sole shareholder. *OIEG I*, at *16 (¶141); *Crystallex II*, 932 F.3d at 148. The Maduro Regime routinely refers to PDVSA, its assets, the PDVH shares, and CITGO as Venezuelan property – in December 2022, Maduro tweeted that PDVSA is "of and for the people," and claimed at a press conference that "'we are [CITGO's] original owners; PDVSA owns CITGO and its dividends belong to our country.'" Kelley Exs. 48, 49.  Maduro's foreign affairs minister stated in May 2023 that CITGO belongs to Venezuela and that a recent OFAC license allowing the National Assembly to negotiate PDVSA's debts is an attempt to "rob" Venezuela of CITGO.  Kelley Ex. 50 (news article).

3.   *The Maduro Regime Controls PDVSA's Daily Affairs in Venezuela*

Venezuelan officials "maintain a strong presence in [PDVSA's] daily affairs."  *OIEG II*, at *10.  Within Venezuela, PDVSA's president, directors, vice presidents, and shareholder council are all appointed by presidential decree. *Crystallex II*, 932 F.3d at 148; *see* Kelley Ex. 51 (January 9, 2023 presidential decree appointing PDVSA board of directors).  Maduro routinely appoints government officials, including military leaders, to fill high-level positions in PDVSA.  For decades, PDVSA's president has also served as Venezuela's oil minister. *Crystallex II*, 932 F.3d at 148.  Pedro Tellechea, an army colonel who has been involved in Venezuela-owned companies for years, has held both roles since March 21, 2023, and prior to Tellechea, Tareck El Aissami, "a long-time lieutenant," served as both External Director of PDVSA and Minister of Petroleum. *OIEG I*, at *16 (¶147); Kelley Ex. 51 (Jan. 9, 2023 presidential decree); Ex. 52 (Mar. 23, 2023

15

PDVSA press release); *see also* Gomez Report ¶¶ 16-18.  Also in 2023, Erick Jacinto Perez Rodriguez dual-hatted as Vice Minister of Petroleum and PDVSA's Vice President of Exploration and Production.  *See* Kelley Ex. 51 (Jan. 9, 2023 presidential decree); Ex. 53 (Dec. 14, 2020 presidential decree); Ex. 54 (Perez LinkedIn profile).  And the Maduro Regime has used a recent corruption crackdown as an opportunity to consolidate its power over PDVSA.  Gomez Report ¶¶ 17-18; Kelley Ex. 55 (Apr. 27, 2023 Reuters article).

PDVSA is a conduit for Venezuelan domestic energy policy.  It is "'attached to'" and "controlled by" Venezuela.  Kelley Ex. 16 at 30 n.84 (PDVSA brief).  Its website admits that it is "***subordinate to the Venezuelan State***," that the Venezuelan people are "the true owner of the oil," and that the Ministry of Petroleum is "in charge of the national oil policy."  Kelley Ex. 56 (emphasis added).  In April of this year, PDVSA tweeted that it executes Maduro's "monitoring and management policies" and in June, the Venezuelan Minister of Petroleum issued a press release stating that PDVSA complies with Maduro's "instructions and guidelines."  Kelley Ex. 57 (PDVSA tweet); Ex. 58 (Ministry of Petroleum press release); *see also* Kelley Ex. 59 (Apr. 25, 2023 PDVSA press release discussing Maduro's instructions); Ex. 60 (PDVSA press release stating that it is "complying with the guidelines set by President Nicolás Maduro").  For PDVSA, failing to meet its goals is tantamount to "fail[ing] Venezuela and . . . Maduro."  Kelley Ex. 61 (May 9, 2023 PDVSA press release).  Maduro, on the other hand, takes credit for PDVSA's oil deals.  For example, in December 2022, Maduro announced a deal between PDVSA and Chevron in PDVSA's Caracas office, referring to the deal as a "'positive step'" for Venezuela.  Kelley Ex.

62 (news article).  And the National Assembly continues to criticize PDVSA's policies, evidencing its understanding that PDVSA is dominated by Maduro.[5]  *Cf. OIEG I*, at *15 (¶¶ 136-137).

PDVSA and Venezuela's physical plant, personnel, and legal strategies are inextricable, too.  PDVSA and the Ministry of Petroleum continue to share physical office space.  *Crystallex II*, 932 F.3d at 148.  For example, in March, Tellechea – PDVSA's president and Venezuela's oil minister – held a meeting at "the Simón Bolívar Room of the Ministry for Petroleum" in the PDVSA Complex in La Campiña.  Kelley Ex. 63 (Mar. 23, 2023 PDVSA press release).  Tellechea publicly refers to PDVSA and Venezuela as "'a single work team . . . a single family.'"  *Id*.  And just this year, the National Constituent Assembly authorized Venezuela's Attorney General to exercise "control and supervision" over PDVSA's legal department.  Kelley Ex. 64 § 10.

### 4.   *The Maduro Regime Is the Real Beneficiary of PDVSA's Conduct in Venezuela*

PDVSA continues to "exist[ ] to benefit Venezuela."  *OIEG II*, at *10.  PDVSA's website states that one of its strategic objectives is to "'[s]upport the geopolitical positioning of Venezuela internationally.'"  Kelley Ex. 56 at 2.  As this Court observed in *OIEG I*, Maduro uses PDVSA's property, particularly its oil, to support Venezuela's foreign policy, including to satisfy commitments made by Maduro, not PDVSA.  *See* pp. 14-15, *supra*.  Maduro also recently vowed to revive PetroCaribe, which requires PDVSA to supply oil to member states at steep discounts in exchange for political clout and discounts on goods and services.  *Crystallex II*, 932 F.3d at 147; Kelley Ex. 65 (Oct. 8, 2022 Bloomberg article); Ex. 66 (June 29, 2022 Maduro tweet).

The Maduro Regime also spends PDVSA's proceeds on public goods for Venezuelans.  PDVSA's website states that it uses its "[o]il revenues . . . for health, food, investment, roads and

---

[5] *See, e.g.*, Kelley Ex. 22 (blaming fuel shortage and poor quality of gasoline in Venezuela on the Maduro Regime's mismanagement of PDVSA); Ex. 23 (similar); Ex. 37 (similar).

various funds" and administers social programs "in coordination with the social plans of Venezuela."  Kelley Ex. 38; *see also* Gomez Report ¶¶ 14, 17.  On May 2, 2023, Maduro announced on Twitter that he ordered PDVSA to donate drilling equipment to Venezuela's National Fund for Social Benefits.  Kelley Ex. 67.  PDVSA also manages and administers various state services, like hospitals.  *See* Kelley Ex. 39 (Mar. 29, 2023 PDVSA press release).  These diversions of PDVSA assets and revenues into "Venezuelan programs that have nothing to do with its business" demonstrate that Venezuela is the real beneficiary of PDVSA's conduct.  *Crystallex I*, 333 F. Supp. 3d at 409; *see Crystallex II*, 932 F.3d at 146-47.

> 5. *The Maduro Regime Continues To Benefit in U.S. Courts While Avoiding Its Obligations*

For the same reasons set forth above, maintaining separateness between the Maduro Regime and PDVSA would entitle Venezuela to benefit from U.S. courts while avoiding its obligations.  *See* p. 13, *supra*; *OIEG I*, at *17-18 (¶¶ 163-164).

## ARGUMENT

I.   **THE VENEZUELA PARTIES ARE ESTOPPED FROM CONTESTING THEIR ALTER-EGO STATUS BEFORE MARCH 23, 2023**

This Court has already ruled that PDVSA was Venezuela's alter ego "through at least March 23, 2023."  D.I. 34.[6]  The Venezuela Parties are both collaterally estopped and judicially estopped from relitigating the same issue over the same period of time.

### A.   The Venezuela Parties Are Collaterally Estopped

Collateral estoppel requires that (1) the issue sought to be precluded is the same as that involved in the prior actions; (2) it was actually litigated; (3) it was determined by final and valid

---

[6] "The Court previously found in *Crystallex I* that, as of August 9, 2018, PDVSA was the alter ego of Venezuela."  *OIEG I*, at *7 (¶ 55) (citing *Crystallex I*, 333 F. Supp. 3d at 406).

judgments; and (4) the determination was essential to the prior judgments. *United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 316 (3d Cir. 2019).  All four requirements are met here.[7]

            1.    *The Issues Are Identical*

       This Court has twice decided, and the Third Circuit has twice affirmed, that PDVSA was Venezuela's alter ego. *See* pp. 3-6, *supra*.  In *Crystallex I*, this Court held that PDVSA was Venezuela's alter ego as of August 2018. *OIEG I*, at \*1.  And in *OIEG I*, the Court picked up where it left off, holding that PDVSA continued to be the alter ego of Venezuela through March 2023. *Id.* at \*27.  Between *OIEG I* and *Crystallex I*, the Court determined the Venezuela Parties' alter-ego status on "all . . . pertinent dates" through March 2023. *Id.*  The Venezuela Parties are therefore estopped from relitigating that same issue over that same period of time.

       Venezuela has argued that it should be allowed to introduce evidence about the post-Guaidó period that it decided not to introduce in *OIEG I* based on its impression that such evidence would not "move the needle in the Court's analysis."  Venezuela Opp. at 11, D.I. 27.  But "it is the entire **issue** that is precluded, not just the particular arguments raised" – or not raised – by the parties. *McLaughlin v. Fisher*, 277 F. App'x 207, 214 (3d Cir. 2008) (quoting *Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) (emphasis preserved)).  The Venezuela Parties had ample opportunity to introduce that evidence; they chose not to, and they must "bear[] the consequences of inadequate litigation." *Id.*; *see also Alevras v. Tacopina*, 226 F. App'x 222, 230 (3d Cir. 2007) ("Issue preclusion may be used to bar the introduction of additional evidence.");

---

[7] Contrary to Venezuela's argument in Contrarian's prior attachment motion, Contrarian need not establish estoppel "beyond a reasonable doubt."  Venezuela Opp. at 9, D.I. 27.  The case Venezuela cited for that proposition, *Kauffman v. Moss*, 420 F.2d 1270, 1274 (3d Cir. 1970), addressed whether "**a prior criminal trial**" had estoppel effect, *Devon Drive Lionville, LP v. Parke Bancorp, Inc.*, No. 15 Civ. 3435, 2017 WL 5668053, at \*15 n.10 (E.D. Pa. Nov. 27, 2017) (emphasis added).

Restatement (Second) of Judgments § 27 cmt. C ("[N]ew evidentiary facts may not be brought forward to obtain a different determination.").[8]

The argument Venezuela previewed at the June 26 status conference – that purchasers of Venezuelan bonds would not have expected PDVSA to be an obligor – is misguided.  Kelley Ex. 68 at 15:12-20 (June 26, 2023 Status Conference Tr.).  ACL, one of the creditors in *OIEG*, also held Venezuela bonds, just like Contrarian.  *OIEG I*, at *6.  At least one other creditor, Huntington Ingalls, voluntarily contracted with Venezuela.  *Id.* at *5.  The Venezuela Parties did not raise arguments about creditor expectations in *OIEG* and cannot do so now.  In any event, none of the *Bancec* factors address anything like creditor expectations, and they are irrelevant to the alter-ego analysis.  *Scooper Dooper, Inc. v. Kraftco Corp.*, 494 F.2d 840, 846 (3d Cir. 1974) (factual differences must be "material" or "controlling" to defeat estoppel).

> 2.    *The Issue Was Actually Litigated*

The Venezuela Parties extensively litigated their alter-ego status before March 2023.  In *Crystallex I*, the Venezuela Parties submitted several briefs, supplemental authorities, declarations, and exhibits, and participated in two separate hearings. 333 F. Supp. 3d at 386.  In *OIEG*, they briefed the alter-ego issue four times in response to four different creditors' motions and participated in a full day evidentiary hearing.  *OIEG I*, at *1 & n.1.  The Venezuela Parties deliberately chose not to introduce facts relevant to the alter-ego analysis after the April 2021 hearing.  Kelley Ex. 69 at 29:2-5 (Mar. 30, 2023 *OIEG* Status Conference Tr.); Venezuela Opp. at 11, D.I. 27.  The failure to present evidence does not mean an issue was not litigated.  *See* 18A Wright & Miller, Fed. Prac. & Proc. § 4419 (3d ed. 2023) ("Preclusion may be appropriate . . .

---

[8] At a minimum, the Venezuela Parties are collaterally estopped from relitigating their alter-ego status through October 13, 2022 – the date they stipulated in *OIEG* and "other proceedings" that there had been no material factual changes to the alter-ego relationship.  *See* p. 21, *infra*.

when no evidence whatever is introduced."); *United States v. Silliman*, 167 F.2d 607, 617 (3d Cir. 1948) ("If an issue is raised and the party who has the burden fails in his proof and the issue is decided against him, he is just as much bound by collateral estoppel as though he had presented a barrel of testimony.").

Venezuela has suggested that facts established by stipulation are not actually litigated. Venezuela Opp. at 13 n.23, D.I. 27. But that is so only if the parties intended for the stipulation not to finally decide any issues. *See In re Graham*, 973 F.2d 1089, 1097 (3d Cir. 1992) (stipulation's preclusive effect depends on "intent of the parties"). Here, the Venezuela Parties stipulated on October 13, 2022 that they did "not believe and will not argue, ***in these proceedings or any other***, . . . there has been any material change to any fact relevant to" the alter-ego issue since April 2021. Joint Status Report at 4-5, *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, No. 21 Misc. 481, D.I. 30 (D. Del. Oct. 13, 2022) (emphasis added). By agreeing not to raise factual changes in "any other" proceeding, the stipulation clearly "manifested an intention" to have preclusive effect in other cases, like Contrarian's. 3 Moore's Fed. Prac. & Proc. § 30.73 (2023). Later, PDVSA again stipulated there had been no "material change . . . since April 2021." Stipulation at 3, *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, No. 22 Misc. 453, D.I. 21 (D. Del. Jan. 27, 2023).

The Court relied on these stipulations in *OIEG*, noting that "PDVSA made a binding representation." *OIEG I*, at *19 (¶ 170); *see also id.* n.14 ("The Court infers . . . [that the parties] continue to agree there has been no material factual change since April 30, 2021."). And factual determinations made by a judge are "actually litigated" even if " 'the determinations rest in part on . . . stipulations.' " *United States v. Brace*, 334 F.R.D. 472, 483 (W.D. Pa. 2020) (quoting *Kairys v. I.N.S.*, 981 F.2d 937, 941 (7th Cir. 1992)).

3.      *The Issue Was Decided by Final Judgments*

This Court actually, necessarily, and finally decided the alter-ego issue through March 2023 in two detailed and reasoned decisions.  *OIEG I*, at *1-30; *Crystallex I*, 333 F. Supp. 3d at 385-426.  The decisions carefully considered and rejected the Venezuela Parties' arguments. *OIEG I*, at *23-29; *Crystallex I*, 333 F. Supp. 3d at 422-25.  They were affirmed by the Third Circuit.  *See* pp. 3-6, *supra*.  Thus, the Court's orders were "final judgment[s]" because the Court provided reasoned opinions, gave no indication the decisions were tentative, and the decisions were actually appealed and affirmed.  *In re Brown*, 951 F.2d 564, 569 (3d Cir. 1991).

4.      *The Issue Was Essential to the Prior Judgments*

The Venezuela Parties' alter-ego status through March 2023 was essential to the *Crystallex* and *OIEG* decisions.  *See Crystallex I*, 333 F. Supp. 3d at 414; *OIEG I*, at *30.  The Court could not have granted the motions for writ of attachment unless it determined that "at the pertinent time, PDVSA was and/or is the alter ego in Venezuela."  *OIEG I*, at *1.

                    *       *       *       *       *

Also, equity supports applying collateral estoppel.  "A finding of fairness to the defendant[s]" is easily made here.  *Raytech Corp. v. White*, 54 F.3d 187, 195 (3d Cir. 1995).  The Venezuela Parties had a full and fair opportunity to litigate the alter-ego issue before March 2023 and remain free to present evidence from after March 2023.  And the prior actions did not have any defects that would counsel against estoppel.  Venezuela and PDVSA had significant exposure in the prior cases, with more than $2.8 billion in attachment liability from the plaintiffs in the *Crystallex* and *OIEG* cases alone.  *See* Opening Brief at 2-3, *Rusoro Mining Ltd. v. Bolivian Republic of Venezuela*, No. 21 Misc. 481, D.I. 60 (D. Del. May 24, 2023).  They knew there would be other judgment creditors, such as Contrarian, who would seek to attach PDVSA's assets.  *Id.* The Venezuela Parties had every incentive to defend the prior cases "vigorously," in part because

22

future suits were clearly "foreseeable." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330-31 (1979).

Applying preclusion is equitable.  Allowing the Venezuela Parties to relitigate the alter-ego issue would create further delays and waste judicial resources. *Montana v. United States*, 440 U.S. 147, 153-54 (1979).  Venezuela is a "highly-recalcitrant judgment debtor" that has a history of delaying proceedings to avoid paying its debts. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 17 Misc. 151, 2021 WL 129803 ("*Crystallex 2021*"), at *18 (D. Del. Jan. 14, 2021); *see In re Myers*, 491 F.3d 120, 129 (3d Cir. 2007) (equity punishes "dilatory tactics").  Unless collateral estoppel applies, Venezuela "could simply wait a few days and relitigate" any adverse decision. *Yeshiva Imeri Chaim Viznitz of Boro Park, Inc. v. City of New York*, 496 F. App'x 122, 124 (2d Cir. 2012).

Allowing relitigation of decided facts would prejudice all creditors, not just Contrarian. Because "the alter-ego inquiry should consider all relevant facts up to the time of the service of the writ of attachment," *OIEG II,* at *9, the relevant period for all creditors waiting for service of a writ is the same.  If the Court allowed the Venezuela Parties to relitigate their alter-ego status before March 2023, a contrary decision would upend settled expectations and the "law of the case" in related proceedings. *See In re Resyn Corp.*, 945 F.2d 1279, 1281 (3d Cir. 1991).  Applying estoppel is the equitable result to avoid "inconsistent decisions" that treat similarly situated creditors differently. *Montana*, 440 U.S. at 153-54.

### B.   The Venezuela Parties Are Judicially Estopped

The Venezuela Parties are also judicially estopped from contesting their alter-ego status before March 2023.  Judicial estoppel prevents "a litigant from asserting a position inconsistent with one that she has previously asserted." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996).  The doctrine may be invoked by a non-party to a prior

proceeding to prevent a litigant from "play[ing] fast and loose with the courts." *Id.* at 361.  To determine if judicial estoppel is appropriate, courts consider "(1) whether [the estopped] party's current position is 'clearly inconsistent' with its earlier position, (2) whether acceptance of later inconsistent position would create 'perception' that court had been 'misled,' and (3) 'whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Crystallex 2021*, 2021 WL 129803, at *11 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)).

Judicial estoppel applies here.  The Venezuela Parties twice filed stipulations with the Court representing there were no material changes in facts relevant to the alter-ego analysis.  *See* p. 21, *supra*; Fed. Prac. & Proc. § 4443 (judicial estoppel "may bind a party to an admission or stipulation even though issue preclusion does not apply").  They made these representations knowing that the Court would rely on them.  *OIEG I*, at *19 n.14.  Those positions cannot be reconciled with a claim that there *were* material factual changes before March 2023.  If the Court were to allow the Venezuela Parties to relitigate their alter-ego status before March 2023, they would be "unfairly advantaged" through further delays in the attachment proceedings, which would give them another chance to run out the clock and avoid liability.  *See* p. 23, *supra*.[9]

## II.  THE FSIA PERMITS ATTACHMENT OF PDVSA'S PDVH SHARES

To attach the PDVH shares, the Foreign Sovereign Immunities Act requires Contrarian to show that the PDVH shares do not enjoy "attachment immunity" from execution and that

---

[9] This is not the first time that the Venezuela Parties have played games with this Court.  The Court previously held that PDVSA should not prevail on an argument because, given its "lack of candor with the Court," consideration of that argument would be "grossly unfair to Crystallex and would undermine the integrity of these proceedings." *Crystallex 2021*, 2021 WL 129803, at *12.

Venezuela does not enjoy "jurisdictional immunity" from suit. *Crystallex I*, 333 F. Supp. 3d at 394-95; *see* 28 U.S.C. §§ 1604, 1610. Contrarian satisfies both tests.

### A.      There Is No Attachment Immunity

The FSIA permits court-ordered attachment of sovereign property in aid of execution of a judgment where (1) the sovereign holds that property in the United States through an alter ego, (2) the property is being used for a commercial activity, (3) the sovereign has waived its immunity from attachment in aid of execution, and (4) a reasonable period of time has elapsed following the entry of judgment. 28 U.S.C. § 1610(a), (a)(1), (c). Each of these requirements is satisfied here.

> 1.      *Venezuela Holds the PDVH Shares in the United States Through Its Alter Ego, PDVSA*

PDVSA is the 100% owner of the PDVH shares, and those shares are located in Delaware. *See* p. 29, *infra*. PDVSA's shares in PDVH may be attached to satisfy Venezuela's debt to Contrarian because PDVSA is Venezuela's alter ego under the factors set forth in *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816 (2018):

> (1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations.

*OIEG II*, at *9.

In *OIEG II*, the Third Circuit clarified the law specifically governing Venezuela's alter-ego relationship with PDVSA. First, it held that the alter-ego analysis is not confined to a particular time period, and courts should evaluate "all relevant facts up to the time of the service of the writ of attachment." *OIEG II*, at *9. The Third Circuit cautioned against focusing on "how a state acts after learning that its actions surrounding an instrumentality are under scrutiny," since there is "'room for manipulation.'" *Id.* at *8. Second, the Third Circuit held that the pertinent

"actor" for the alter-ego analysis "transcends any administrator." *Id.* at *7. Rather, the focus should be on the "sovereign" – Venezuela – including "the actions of both" the National Assembly and the Maduro Regime. *Id.* at *6.

Following the Third Circuit's decision in *OIEG II*, there is little left for the Venezuela Parties to argue. This Court has already assessed most of the facts relevant to Contrarian's motion – Venezuela's control of PDVSA in the six years since Venezuela's default on the debt held by Contrarian – and determined that they support an alter-ego finding. Venezuela's conduct since this Court's prior holdings, such as passage of the 2023 Transition Statute, should receive ***less weight*** because Venezuela is aware that its acts are under scrutiny. *See OIEG II*, at *9. But, as Contrarian will demonstrate at the September 12 hearing, Venezuela and PDVSA's recent conduct confirms that PDVSA continues to be Venezuela's alter ego.[10]

First, the National Assembly continues to treat PDVSA as its alter ego. It exercises economic control over PDVSA outside of Venezuela through the Constitution, the 2023 Transition Statute, the Asset Protection Council, and the PDVSA *ad hoc* Board. It continues to exercise authority over PDVSA's daily affairs through its oversight of PDVSA's activities, finances, and national interest contracts. It continues to assert authority over PDVSA's assets and the assets of its subsidiaries. And it continues to receive PDVSA's profits outside of Venezuela, pay for its legal counsel using PDVSA funds, and use PDVSA as a tool to accomplish its political agenda of ousting Maduro. *See* pp. 6-13, *supra*.

Second, the Maduro Regime also continues to treat PDVSA as its alter ego. It continues to exercise economic control over PDVSA within Venezuela through the Constitution and oversight of PDVSA's oil pricing and supply decisions. It continues to exercise authority over

---

[10] Contrarian reserves the right to introduce additional evidence at the September 12 hearing.

PDVSA's daily affairs through appointments of government officials as directors and high-level officers of PDVSA. And it continues to receive PDVSA's profits within Venezuela, divert PDVSA resources, and use PDVSA as a tool to execute its foreign and domestic policies.  *See* pp. 13-18, *supra*.

### 2.    *The PDVH Shares Are Being Used for a Commercial Activity*

The phrase "commercial activity" in the FSIA captures the "distinction between state sovereign acts, on the one hand, and state commercial and private acts, on the other."  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 613 (1992).   In *OIEG I*, this Court held that the PDVH stock is being used for a commercial activity because "'Venezuela – through PDVSA – uses the shares to appoint directors, approve contracts, and pledge assets as security for PDVSA's debt.'"  *OIEG I*, at \*18 (quoting *Crystallex I*, 333 F. Supp. 3d at 417-18).  As explained above, *see* pp. 18-23, *supra*, PDVSA and Venezuela are collaterally estopped from relitigating that holding.

### 3.    *Venezuela Has Waived Attachment Immunity*

Venezuela "irrevocably agree[d] not to claim and irrevocably waive[d]" immunity from attachment in aid of execution in any "Related Proceeding" in the fiscal agency agreements under which Contrarians' bonds were issued.  *See* Kelley Ex. 70 § 14(d); Ex. 71 § 14(d).  The "Related Proceeding[s]" for which Venezuela waived immunity include "any suit, action or proceeding against [Venezuela] or its properties, assets or revenues with respect to this Agreement."  *Id.* § 14(a).  That waiver is attributable to PDVSA as Venezuela's alter ego.  *Crystallex II*, 932 F. 3d at 139; *Crystallex I*, 333 F. Supp. 3d at 415.

### 4.    *A Reasonable Amount of Time Has Passed since Entry of Judgment*

PDVSA and Venezuela cannot deny that "a reasonable period of time has elapsed following the entry of judgment."  28 U.S.C. § 1610(c).  The Southern District of New York already found, over Venezuela's objection, that Section 1610(c) was satisfied for the May 2021

judgment after four months had passed without any payment.  -11018 Action, D.I. 120.  That ruling applies to Contrarian's other two judgments, which have been outstanding for more than 32 and 20 months, respectively.  And this Court has repeatedly held that even shorter amounts of time are reasonable.  *See, e.g.*, *OIEG I*, at *10 (finding 14 months reasonable); *Red Tree Investments, LLC v. Petróleos de Venezuela, S.A.*, No. 22 Misc. 68, 2022 WL 1265516, at *2 (D. Del. Apr. 28, 2022) (finding 4 months reasonable).

Section 1610(c)'s "reasonable period of time" test is meant to allow a foreign government enough time to arrange a payment.  *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 419 F. Supp. 3d 51, 54 (D.D.C. 2019).  Here, Venezuela has had ample time to pay Contrarian's judgments but has instead chosen to fight payment at every turn.

### B.      There Is No Jurisdictional Immunity

Under the FSIA, foreign states can waive their immunity from suit.  28 U.S.C. § 1605(a)(1).  The Southern District of New York held that Venezuela waived its sovereign immunity for purposes of Contrarian's suit.  *Contrarian Cap. Mgmt., L.L.C. v. Bolivarian Republic of Venezuela*, No. 19 Civ. 11018, 2020 WL 5849013, at *4 (S.D.N.Y. Oct. 1, 2020).  Contrarian then obtained three judgments against Venezuela.  *See* pp. 2-3, *supra*.  And once a party establishes an exception to sovereign immunity and obtains a merits judgment, it need not establish another exception to register the judgment in another court and enforce it.  *Crystallex II*, 932 F.3d at 137.

### III.   DELAWARE LAW PERMITS ATTACHMENT OF PDVSA'S PDVH SHARES

Rule 69 permits enforcement of a money judgment in accordance with "the procedure of the state where the court is located."  Fed. R. Civ. P. 69(a)(1).  Delaware law entitles a judgment creditor to attach a debtor's shares in a Delaware corporation through a writ of attachment *fieri facias*.  8 *Del. C.* § 324(a); *Crystallex II*, 932 F.3d at 134.

PDVSA is the sole owner of the shares of PDVH, a Delaware corporation. *OIEG I*, at *1, *3; *see also Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 17 Misc. 151 (D. Del.), D.I. 177 (answer by PDVH). By law, those shares are located in Delaware because PDVH is incorporated in Delaware. 8 *Del. C.* § 169; *see Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*, 251 F. Supp. 3d 758, 762 (D. Del. 2017). Accordingly, a judgment creditor may attach the PDVH shares to satisfy its judgments. *See* 10 *Del. C.* § 5031; 8 *Del. C.* § 324(a); *see also OIEG I*, at *29 (Delaware law permits attachment of the PDVH shares).

The Venezuela Parties may argue that Delaware's alter-ego test, which requires a showing of fraud or injustice, governs here. But in *OIEG I*, this Court pointed out that both it and the Third Circuit had already rejected this argument and proceeded to reject the argument once again. *OIEG I*, at *29 (citing *Crystallex I*, 333 F. Supp. 3d at 397 and *Crystallex II*, 932 F.3d at 145). Venezuela should not get a fourth bite at the apple, and it is collaterally estopped from relitigating the same issue again here. *See* pp. 18-23, *supra*.

Venezuela is also wrong on the merits. Federal execution proceedings must follow "the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Fed. R. Civ. P. 69(a)(1). Because the standard for alter-ego liability is substantive, not procedural, Delaware's rule does not govern. *See Meadows v. Dominican Republic*, 817 F.2d 517, 524 (9th Cir. 1987) ("[I]dentity for purposes of attribution of liability among instrumentalities of a foreign state is a matter of substantive law."). And even if it was procedural, Delaware's rule would be displaced by the *Bancec* doctrine – the FSIA's "federal common-law outgrowth" – which "exists specifically to enable federal courts . . . to disregard the corporate separateness of foreign sovereigns." *Crystallex II*, 932 F.3d at 139.

IV.   **THE COURT SHOULD NAME PLAINTIFFS ADDITIONAL JUDGMENT CREDITORS**

Contrarian adopts the arguments set forth by Red Tree Investments, L.L.C. regarding whether the Court should name parties as Additional Judgment Creditors under the Sale Process Order.  Kelley Ex. 72 at 2 (Red Tree opening brief).  If the Court holds that PDVSA is Venezuela's alter ego, then Contrarian has a right to attach PDVSA's assets to satisfy its judgments against Venezuela.  The Court should name Plaintiffs Additional Judgment Creditors so they may serve their writ of attachment and participate in the Sale Process.

**CONCLUSION**

The Court should (1) find that a reasonable period of time has elapsed pursuant to 28 U.S.C. §1610(c), (2) hold that the PDVH shares are subject to attachment to satisfy Contrarian's judgments; (3) name Plaintiffs Additional Judgment Creditors, and (4) authorize the issuance and service of a writ of attachment *fieri facias*.

Dated:    July 21, 2023

Respectfully submitted,

/s/ *Rebecca L. Butcher*

| | |
|---|---|
| Steven F. Molo (admitted *pro hac vice*) | Rebecca L. Butcher (#3816) |
| Justin M. Ellis (admitted *pro hac vice*) | Jennifer L. Cree (#5919) |
| Lauren F. Dayton (admitted *pro hac vice*) | LANDIS RATH & COBB LLP |
| Mark W. Kelley (admitted *pro hac vice*) | 919 Market Street, Suite 1800 |
| Ryan Yeh (admitted *pro hac vice*) | Wilmington, DE  19801 |
| MOLOLAMKEN LLP | Tel.: (302) 467-4400 |
| 430 Park Avenue, 6th Floor | Fax: (302) 467-4450 |
| New York, NY  10022 | butcher@lrclaw.com |
| Tel.: (212) 607-8170 | cree@lrclaw.com |
| Fax: (212) 607-8161 | |

Lois S. Ahn (admitted *pro hac vice*)
MOLOLAMKEN LLP
600 New Hampshire Avenue, N.W.
Washington, DC  20037
Tel.: (202) 556-2000
Fax: (202) 556-2001

*Counsel for Plaintiffs*

30